IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-01655-PAB-NYW

HEATHER ROEMER, as parent and next friend of J.R., on behalf of the estate of
James Roemer, and
SAMANTHA McCLELLAN, as parent and next friend of J.M., on behalf of the estate of
James Roemer,

      Plaintiffs,

v.

TONY CAROCHI, in his individual capacity,
KEVIN MILYARD, in his individual capacity,
LOU ARCHULETA, in his individual capacity,
ANGEL MEDINA, in his individual capacity,
JAMES FALK, in his individual capacity,
JOHN CHAPDELAINE, in his individual capacity,
MARY COX-BERGMAN, in her individual capacity,
MICHELLE NYCZ, in her individual capacity,
ROBERT KEISEL, in his individual capacity,
CHASE FELZEIN, in his individual capacity,
CORRECTIONAL OFFICER BOYER, in his individual capacity,
SERGEANT CLEMENTS, in his individual capacity,
EVA LITTLE, in her individual capacity,
MICHAEL TIDWELL, in his individual capacity,
NEIL MAGELSSEN, in his individual capacity,
CASE MANAGER HERRERA, in his individual capacity, and
ALI SHOWAGA, in his individual capacity,

      Defendants.
_____

**ORDER**
_____

      This matter is before the Court on the Motion to Dismiss Pursuant to Fed. R. Civ.

P. 12(b)(6) [Docket No. 15 (public entry at Docket No. 37)] filed by all defendants.  This

Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[1]

The case arises out of the June 2012 death of James Roemer.  Mr. Roemer was killed by his cellmate Paul Farley while incarcerated at the Sterling Correctional Facility ("SCF") in Sterling, Colorado.  Mr. Roemer's estate brings this case against Colorado Department of Corrections ("CDOC") staff.[2]

SCF is a mixed custody facility housing approximately 2,500 inmates.  Docket No. 1 at 8, ¶ 23 (public entry at Docket No. 42).  SCF is regarded as one of the more dangerous and violent prisons in the CDOC system.  *Id.* at 8, ¶ 24.  SCF is divided into two sides, SCF East and SCF West, with the former housing minimum restrictive custody prisoners and the latter housing medium and "close" custody prisoners.  *Id.* at

---

[1]The following facts are taken from plaintiff's complaint and are presumed true for purposes of resolving this motion.  Plaintiff's factual allegations are presumed true unless, as noted herein, they are legal conclusions, conclusory, or contradicted by other allegations of plaintiffs.  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) ("conclusory and formulaic recitations" of the elements "are insufficient to survive a motion to dismiss"); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 152 (2d Cir. 2014) (holding that "general allegations that are contradicted by more specific allegations in the Complaint" need not be accepted as true (quotation omitted)).  Because the complaint does not refer to documents filed at Docket No. 24-2 and Docket No. 24-3, the Court does not consider them at the motion to dismiss stage, *see Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007), and takes no position as to how such evidence would affect the analysis of plaintiff's claims at summary judgment.

[2]Defendants state that, although the caption indicates that this suit is brought on behalf of Mr. Roemer's minor children and their mothers, plaintiffs' counsel represented to defendants that Mr. Roemer's estate is the only plaintiff in this case.  Docket No. 15 at 2 n.1.  Plaintiffs' response brief continues to refer to the plaintiffs as Mr. Roemer's minor children and their mothers on behalf of Mr. Roemer's estate.  *See* Docket No. 24 at 1-2.  The remedy in 42 U.S.C. § 1983 death cases is a "survival action, brought by the estate of the deceased victim."  *Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1506-07 (10th Cir. 1990).  Thus, the Court considers Mr. Roemer's estate as the sole plaintiff in this case.

8, ¶ 25.  SCF West has four units.  Unit 1 and Unit 1 of SCF West were generally considered the more dangerous area of SCF West.  *Id.* at 9, ¶ 27.  Plaintiff claims that SCF and CDOC did not employ a coherent classification method for determining which inmates were housed in Unit 2.  *Id.* at 10, ¶ 35.

Each unit at SCF contains three, 54-cell pods.  Each pod is arranged in three tiers of 18 cells.  *Id.* at 9, ¶¶ 26, 28.  Each cell is approximately 77 square feet and contains bunk beds, two writing desks, and a combination sink/toilet.  *Id.* at 9, ¶ 29.  At all times relevant, each cell in Unit 2 of SCF West was occupied by two inmates, i.e. "double celled."  *Id.* at 9, ¶ 31.  Prior to June 2012, prisoners were generally allowed out of their cells for approximately 12 hours per day.  *See id.* at 10, ¶ 36.  Access to programming, exercise opportunities, the SCF law library, and kitchen and dining facilities was limited and insufficient for Unit 2 inmates.  *Id.* at 9-10, ¶ 32.  Unit 2's "day room" – an area where inmates can recreate and socialize – did not contain enough tables and chairs for all of the inmates housed in Unit 2.  *Id.* at 10, ¶ 33.

Plaintiff brings this case against five groups of defendants.[3]  In the first category are defendants who held executive positions within the CDOC (collectively, the "CDOC defendants").  Defendant Tony Carochi was Director of Prisons for the CDOC and oversaw the operations and management of twenty public and five privately operated prisons.  *Id.* at 2, ¶ 3.  Defendant Kevin Milyard was, according to plaintiff, either Deputy Director of Prisons for the CDOC or the Warden at SCF.  In the former capacity, Mr. Milyard managed approximately half of CDOC's prisons, including SCF, and in the latter

---

[3]Defendants held their respective positions at all times relevant to the events alleged in the complaint.

capacity he was responsible for the appropriate classification and safe housing of SCF inmates. *Id.* at 2-3, ¶ 4. Defendants Lou Archuleta and Angel Medina each held the position of Director of Offender Services for the CDOC and were responsible for ensuring that SCF prisoners were appropriately classified and safely housed. *Id.* at 3, ¶¶ 5-6.

In the second category are defendants who held upper management positions at SCF (collectively, the "executive defendants"). Defendant James Falk was, along with Mr. Milyard, Warden of SCF during the relevant time. *Id.* at 3-4, ¶ 4, 7.[4] Defendant John Chapdelaine was either Acting Warden or Associate Warden of SCF. *Id.* at 4, ¶ 8. Defendants Mary Cox-Bergman and Michelle Nycz held the rank of major at SCF. *Id.* at 4-5, ¶¶ 9-10. Plaintiff alleges that the executive defendants were responsible for ensuring that SCF prisoners were appropriately classified and safely housed. *Id.* at 4-5, ¶¶ 7-10.

In the third category are defendants responsible for managing Unit 2 at SCF (collectively, the "Unit 2 defendants"). Robert Keisel was a captain, defendant Chase Felzein was a lieutenant, defendant Boyer was a correctional officer, and defendant Clements was a sergeant. *Id.* at 5-6, ¶¶ 11-14. The Unit 2 defendants were responsible for "supervising prisoners housed in SCF Unit 2, responding to requests for safe housing made by Unit 2 prisoners, and ensuring the safety and well-being of Unit 2 prisoners." *Id.*

---

[4]Mr. Milyard's alleged dual roles are further discussed below, but, for purposes of resolving this motion, the Court considers Mr. Milyard among the CDOC defendants.

In the fourth category are defendants who engaged in intelligence gathering activities (collectively, the "intelligence defendants").  Defendants Eva Little, Michael Tidwell, and Neil Magelssen were lieutenants at SCF responsible for "investigating, gathering, and analyzing intelligence information pertaining to dangerous or disruptive behavior at SCF to ensure the safety and security of the facility."  *Id.* at 6-7, ¶¶ 15-17.

In the fifth category are SCF case managers (collectively, the "case manager defendants").  Defendant Herrera was a case manager at SCF and was responsible for referring prisoners to programs necessary to their rehabilitation and non-violence.  *Id.* at 7, ¶ 18.  Defendant Showaga was a case manager at SCF responsible for assessing the custody score of incoming CDOC prisoners and "making a custody recommendation to CDOC headquarters that informs the Director of Offender Services' decision as to appropriate classification and housing of new CDOC arrivals."  *Id.* at 7-8, ¶ 19.  Mr. Showaga was also responsible for determining whether prisoners transferred from other jurisdictions' administrative segregation prisons should be "referred to transitional programs designed to mitigate the effects of long-term solitary confinement."  *Id.*

In the two years before November 2011, there were four homicides in SCF West.  *Id.* at 12, ¶ 43.[5]  In November 2011, CDOC executive staff met with SCF executive staff, which included Mr. Falk, in an attempt to determine the cause of those incidents.  *Id.* at 12, ¶ 44.  In November 2011, the American Civil Liberties Union of Colorado

---

[5]Plaintiff alleges that these homicides were caused by SCF staff's deliberate indifference,  *id.*, but does not provide additional facts regarding the circumstances under which these murders occurred.

("ACLU") sent a letter to Mr. Carochi, Mr. Medina, and Mr. Milyard stating that "limited out-of-cell time" at the Limon Correctional Facility ("LCF") led to competition for basic resources and increased tensions. *Id.* at 12, ¶ 45. The letter further stated that LCF inmates had limited access to outdoor recreation and libraries and that the limited access to showers and phones led to fights and complaints from prisoners that they had been "unable to shower for several weeks due to fear of conflict with other prisoners." *Id.* at 12, ¶ 46. The ACLU stated that conditions at LCF "are creating an unstable and unsafe living environment for the prisoners confined there in general population." *Id.* at 13, ¶ 47.

In early 2012, Mr. Roemer was serving a prison sentence for felony trespassing and was due to be released in July 2012. *Id.* at 14, ¶ 55. In the months leading up to his death, Mr. Roemer was housed in Unit 2. *Id.* at 14, ¶ 54. Mr. Roemer was non-aggressive, "laid back," and was not involved in gangs or other disruptive activity. *Id.* at 15, ¶ 58. Mr. Archuleta, Mr. Medina, Mr. Chapdelaine, Ms. Cox-Bergman, Ms. Nycz, Mr. Keisel, and Mr. Felzein assigned Mr. Roemer to Unit 2, "knowing that it was one of the most violent and dangerous units in the CDOC system," *id.* at 15, ¶ 60, knowing that Mr. Roemer was housed under conditions that were substantially likely to cause him to be attacked by a cellmate, no matter who the cellmate was. *Id.* at 15, ¶ 61.

Before September 2011, Mr. Farley was housed with the Arizona Department of Corrections ("ADOC"). *Id.* at 16, ¶ 65. In 1998, Mr. Farley attempted to escape from custody and was placed in administrative segregation or "solitary confinement" for approximately one year, developing "violent tendencies" during that time. *Id.* at 16,

¶¶ 66, 68.  In 1999, Mr. Farley forcibly raped his cellmate after threatening him with a razor blade and was placed back in administrative segregation for slightly less than one year, experiencing violent and homicidal "ideations" as a result.  *Id.* at 16-17, ¶¶ 69-70. In 2000, Mr. Farley was transferred back to general population and cut his cellmate's back with a razor blade.  *Id.* at 17, ¶ 71.  He was again placed in administrative segregation  where he assisted a prisoner in a neighboring cell to commit suicide by strangling him with a bed sheet.  *Id.* at 17, ¶¶ 72-75.  ADOC continued to house Mr. Farley in administrative segregation for the next 11 years.  *Id.* at 17, ¶ 76.  According to plaintiff, while in administrative segregation, Mr. Farley "developed uncontrollable and deeply rooted homicidal ideations" and "would have violent thoughts for hours every day and those violent thoughts would turn into urges."  *Id.* at 17, ¶ 72.  Plaintiff alleges that ADOC staff treated Mr. Farley in such a way as to "bre[ed] in him pure hatred."  *Id.* at 17, ¶ 73.  Plaintiff does not allege that any of the defendants were aware that Mr. Farley had developed homicidal ideations and violent thoughts while with ADOC.

In September 2011, Mr. Farley was transferred to CDOC to serve a lengthy sentence.  *Id.* at 18, ¶ 77.  Because of his 1998 attempted escape from custody, CDOC designated Mr. Farley as a member of a security threat group or dangerous/disruptive group.  *Id.* at 16, ¶ 67.  As a result, the intelligence defendants were responsible for tracking and managing Mr. Farley while he was in the CDOC system.  *Id.*  ADOC "notified CDOC of [Mr. Farley's] violent history, and in particular his history of assaulting and killing cellmates, and strongly recommended that he not be housed with a cellmate specifically because of the risk he would harm that person."  *Id.* at 18, ¶ 78.

Before assignment to a CDOC facility, Mr. Farley was assessed at the CDOC's
Denver Reception and Diagnostic Center ("DRDC") and was recommended for
placement in administrative segregation due to his history of assaulting cellmates. *Id.*
at 18, ¶ 79.  Although aware of Mr. Farley's history of assaulting inmates while with
ADOC, Mr. Showaga determined that Mr. Farley should be placed in general population
and, contrary to sound correctional practices, failed to recommend Mr. Farley for
placement in transitional programming that would address Mr. Farley's violent
tendencies. *Id.* at 18, ¶¶ 80-81.  Plaintiff claims that, by placing Mr. Farley in general
population without appropriate treatment or programming, Mr. Showaga disregarded
the known risk that Mr. Farley would harm a cellmate. *Id.* Plaintiff alleges that Mr.
Archuleta and/or Mr. Medina approved Mr. Farley's placement in general population
without treatment or programming. *Id.* at 19, ¶ 82.  Mr. Archuleta and/or Mr. Medina
approved sending Mr. Farley to SCF knowing that placing him in general population
with a cellmate would create a substantial risk of harm to that cellmate. *Id.*

Plaintiff alleges that, when Mr. Farley arrived at SCF, "Falk, Chapdelaine, Cox-
Bergman, Nycz, Keisel, Felzein, Boyer, Clements, Little, Tidwell, Magelssen, and
Herrera became aware of Mr. Farley's violent history and nonetheless allowed Mr.
Farley to be housed in Unit 2 with a cellmate without providing treatment or
programming to address his violent tendencies." *Id.* at 19, ¶¶ 83-84.  Later in the
complaint, plaintiff alleges that only Mr. Archuleta, Mr. Medina, Mr. Chapdelaine, Ms.
Nycz, Mr. Keisel, Mr. Felzein, Correctional Officer Boyer, Sergeant Clements, Case

Manager Herrera, and Mr. Showaga "personally participated in the decision to house Mr. Farley in general population." *Id.* at 22-23, ¶ 102.

Mr. Farley complained to Case Manager Herrera that it was inappropriate to house him in a double-occupancy general population unit and requested that he be afforded some type of treatment to address his violent tendencies. *Id.* at 20-21, ¶ 90. Case Manager Herrera denied Mr. Farley's request. *Id.*

Before becoming Mr. Roemer's cellmate, Mr. Farley had four cellmates while housed in Unit 2 of SCF. *Id.* at 19, ¶ 85. Plaintiff does not allege that any of his first three cellmates had any problems with Mr. Farley. The fourth cellmate did not get along with Mr. Farley and felt threatened by him. Both Mr. Farley and his cellmate requested that they be separated and both asked Correctional Officer Boyer and Sergeant Clements if Mr. Roemer could become Mr. Farley's new cellmate. *Id.* at 19-20, ¶ 86. Correctional Officer Boyer and Sergeant Clements granted the request and, at the time, were aware of Mr. Farley's violent history and Mr. Roemer's short sentence as well as the housing conditions in Unit 2. *Id.* at 20, ¶¶ 87-88. Plaintiff claims that, in so doing, Correctional Officer Boyer and Mr. Clements deviated from sound correctional practices. *Id.* Plaintiff alleges that Mr. Keisel and Mr. Felzein, as supervising officers in Unit 2, as well as Ms. Cox-Bergman and Ms. Nycz, as the officers responsible for classification decisions at SCF, failed to respond to the risk to Mr. Roemer's life flowing from his placement in a cell with Mr. Farley. *Id.* at 20, ¶ 89. In the days and weeks before his death, Mr. Farley made threatening statements to Mr. Roemer, who began to fear for his safety. *Id.* at 21, ¶ 91. Mr. Roemer asked Correctional Officer Boyer for a

9

cell reassignment, but plaintiff does not allege that Mr. Roemer provided Correctional

Officer Boyer with a reason for his request.  *Id.*  Correctional Officer Boyer denied Mr.

Roemer's request for a cell reassignment.  *Id.*

In early June 2012, SCF instituted a "controlled movement schedule" in Unit 2,

which limited the time prisoners could spend outside their cells to six hours per day: two

hours in the morning, two hours mid-day, and two hours in the evening.  *Id.* at 10, ¶ 36.

Inmates spent the remaining 18 hours of the day in their cells with their cellmates.  *Id.*

at 11, ¶ 41.  The controlled movement schedule limited the amount of time prisoners

had to obtain medications, do laundry, use the phones, shower, attend religious

programming, go to the library, or exercise on the yard or in the gym, especially for

those inmates who had jobs or attended classes.  *Id.* at 11, ¶¶ 37-39.  Plaintiff alleges

that these limitations increased the tension and frustration among SCF prisoners, *id.* at

11, ¶ 40, and "substantially and foreseeably increased the risk of violence within the

prison."  *Id.* at 12, ¶ 42.  On June 7, 2012, the executive defendants instituted a

lockdown lasting approximately six days.  *Id.* at 21, ¶ 94; *Id.* at 13, ¶¶ 49-50.  During the

lockdown, Unit 2 inmates were confined to their cells for 24 hours per day and were

given one 30 minute to one hour period in which to shower or take care of other

necessities.  *Id.* at 13, ¶ 50.

Plaintiff appears to allege that Mr. Roemer was victimized due to two objectively

serious risks.  First, Plaintiff alleges that the conditions in Unit 2, including the controlled

movement schedule and the lockdown, increased tensions and the likelihood of

violence between cellmates (the "June 2012 conditions risk").  *Id.* at 13-14, ¶ 52.

10

Plaintiff alleges that all defendants knew of the increased risk of cellmate violence because the risk was "obvious, previously-known, and well-documented." *Id.* Plaintiff alleges that the conditions of Unit 2 at the relevant time created a substantial risk of cellmate assaults that was obvious, "longstanding, pervasive, and well-documented." *Id.* at 14, ¶ 53. Plaintiff alleges that, although all defendants (except for Mr. Showaga), knew of such risks, no defendant responded appropriately. *Id.* at 21, ¶ 95. However, plaintiff subsequently alleges that only Mr. Carochi, Mr. Milyard, Mr. Falk, Mr. Chapdelaine, Ms. Cox-Bergman, and Ms. Nycz "knew of and/or implemented conditions of confinement at SCF." *Id.* at 22, ¶ 100. Second, plaintiff alleges that housing Mr. Farley in general population with a cellmate posed a risk of violence to whatever inmate was assigned to Mr. Farley's cell (the "risk from Mr. Farley"). *Id.* at 22, ¶ 101. Plaintiff alleges that all defendants knew of the risk of housing Mr. Farley in a double cell, general population environment. *Id.* Plaintiff alleges that the combination of the controlled movement, lockdown, and Mr. Farley's violent history created a particularized risk that he would assault his cellmate. *Id.* at 22-23, ¶ 102. Plaintiff alleges that, although Mr. Farley's homicidal thoughts and violent tendencies subsided during his placement in general population, the controlled movement schedule and lockdown in Unit 2 caused such thoughts and tendencies to return. *Id.* at 21-22, ¶ 96.

On June 13, 2012, Mr. Roemer said something "smart" to Mr. Farley. *Id.* at 22, ¶ 97. Mr. Farley began strangling Mr. Roemer, then placed a plastic bag with a drawstring over Mr. Roemer's head and pulled the drawstring tight. *Id.* Mr. Roemer attempted to resist, but Mr. Farley tightened a belt around Mr. Roemer's neck, causing

him to stop breathing.  *Id.*  Mr. Roemer was pronounced dead later that day.  *Id.* at 22, ¶ 98.

On June 12, 2014, plaintiff filed this case.  Docket No. 1.  Plaintiff asserts a 42 U.S.C. § 1983 claim for violation of the Eighth Amendment against all defendants in their individual capacities.  *Id.* at 22.

## II.  STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted).  Thus, even though the modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).  Where, as here, a defendant invokes the doctrine of qualified immunity, the plaintiff is not subject to a heightened pleading requirement.  *See Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) ("we apply the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally" (quotations omitted)).  Nonetheless, "complaints in

§ 1983 cases against individual government actors pose a greater likelihood of failure in notice and plausibility because they typically include complex claims against multiple defendants." *Id.*

## III. APPLICABLE LAW

### A.  Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Upon a public official's assertion of a qualified immunity defense, plaintiff bears a "heavy burden" under a two-pronged analysis. *Buck v. City of Albuquerque,* 549 F.3d 1269, 1277 (10th Cir. 2008).  Under the first prong of the analysis, the plaintiff is required to "establish that the defendant's actions violated a constitutional or statutory right." *Smith v. Cochran,* 339 F.3d 1205, 1211 (10th Cir. 2003) (quoting *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1185 (10th Cir. 2001)).  The determination of whether a violation occurred under the first prong of the qualified immunity analysis turns on substantive law regarding that right. *See, e.g., Casey v. City of Fed. Heights,* 509 F.3d 1278, 1282-83 (10th Cir. 2007).

Under the second prong, the plaintiff must show that the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  "The relevant, dispositive inquiry in determining whether a right is

clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Casey v. City of Federal Heights,* 509 F.3d 1278, 1283-84 (10th Cir. 2007) (quoting *Saucier,* 533 U.S. at 202). "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Gann v. Cline,* 519 F.3d 1090, 1092 (10th Cir. 2008) (internal quotation marks omitted) (quoting *Anderson v. Blake,* 469 F.3d 910, 914 (10th Cir. 2006)). However, as the Tenth Circuit has pointed out, the "difficult part of this inquiry is identifying the level of generality at which the constitutional right must be 'clearly established.'" *Casey*, 509 F.3d at 1284. As a result, the Tenth Circuit employs a "sliding scale" in identifying clearly established law: "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004)). "As long as the unlawfulness of the [defendant's] actions was 'apparent' 'in light of pre-existing law,' then qualified immunity is inappropriate." *Estate of Booker v. Gomez*, 745 F.3d 405, 433-34 (10th Cir. 2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

### B. Personal Participation

Section 1983 "imposes liability for a defendant's own actions" and thus "personal participation in the specific constitutional violation complained of is essential." *Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011). Section 1983 does not provide for vicarious liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). A plaintiff must show

that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*; *see also Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010) (a plaintiff must "prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well."). "[A] supervisor's mere knowledge of his subordinate's conduct" is not sufficient to hold the supervisor liable under § 1983. *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013); *see also Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) ("Simply put, there's no special rule of liability for supervisors. The test for them is the same as the test for everyone else."); *Woodward v. City of Worland*, 977 F.2d 1392, 1399 n.11 (10th Cir. 1992) ("merely asserting that the defendant 'should have known' of unconstitutional behavior on behalf of his or her subordinates without establishing an intentional, conscious, and deliberate act by the defendant participating in, or knowingly acquiescing in, the unconstitutional behavior fails to allege the requisite scienter for § 1983 liability").

In § 1983 cases, it is particularly important "that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins*, 519 F.3d at 1250 (emphasis in original); *accord Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). In other words, in order to satisfy Fed. R. Civ. P. 8(a)(2), the complaint must "isolate the allegedly unconstitutional acts of each defendant." *Robbins*, 519 F.3d at 1250; *see also Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (unpublished).

### C.  8th Amendment

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("The Eighth Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" (citing *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 199 (1989))).  "The analysis [of an Eighth Amendment claim] should not be based on 'a court's idea of how best to operate a detention facility,'" but should reflect "the evolving standards of decency that mark the progress of a maturing society," which the Tenth Circuit has characterized as a "lofty standard."  *DeSpain v. Uphoff*, 264 F.3d 965, 973-74 (10th Cir. 2001) (citing *Rhodes v. Chapman*, 452 U.S. 337, 351 (1981)).  To prevail on his claim that defendants violated the Eighth Amendment, plaintiff must show that (1) objectively, the harm he complains of is sufficiently "serious" to merit constitutional protection and (2) defendants were subjectively aware of a substantial risk to plaintiff's health or safety and acted in purposeful disregard of that risk.  *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

As to the objective element, a plaintiff must establish that "he [was] incarcerated under conditions posing a substantial risk of serious harm," *Farmer*, 511 U.S. at 834, which requires "more than ordinary lack of due care for the prisoner's interests or safety."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *compare Benshoof v. Layton*, 351 F. App'x 274, 277 (10th Cir. 2009) (unpublished) (finding objective element satisfied

where plaintiff was forced to remain in cell with stinging fire ants for six days), *with Montez v. Lampert*, 595 F. App'x 789, 792 (10th Cir. 2014) (unpublished) ("[A] 15-year-old hernia operation would neither present symptoms readily ascertainable to a lay person, nor make it obvious to a lay person that a bottom-bunk assignment was necessary.  Montez thus fails the objective prong of the *Farmer* test.").

As to the subjective element, the Eighth Amendment does not reach a prison official's conduct unless the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837; *see also Verdecia v. Adams*, 327 F.3d 1171, 1175-76 (10th Cir. 2003) ("Deliberate indifference requires that the defendant's conduct is in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, or that the conduct disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." (internal citations omitted)).   A prisoner must therefore establish "that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."  *Martinez*, 563 F.3d at 1089 (quotations omitted).  An action or inaction unaccompanied by a subjective awareness of an unreasonable risk of harm does not constitute "punishment" within the meaning of the Eighth Amendment.  *Farmer*, 511 U.S. at 837-38.  A court "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."  *Hope v. Pelzer*, 536 U.S. 730, 738 (2002); *see also Farmer*, 511 U.S. 842 (noting that state of

17

mind can be established with circumstantial evidence and "from the very fact that the

risk was obvious").  The negligent conduct of a prison official is, in all cases, insufficient

to rise to the level of deliberate indifference.  *Farmer*, 511 U.S. at 835 ("Eighth

Amendment liability requires more than ordinary lack of due care for the prisoner's

interests or safety" (quotations omitted)).

Prisoner assault cases also tend to hinge on precisely what risk is alleged to

have led to a prisoner's injuries.  *See, e.g.*, *Iwanski v. Ray*, 44 F. App'x 370, 373 (10th

Cir. 2002) (distinguishing between risk that specific inmate would harm plaintiff and

threat that specific inmate posed to all other inmates at facility due to combination of

inmate's violent background, availability of object that could be used as weapon, and

lax security at the facility).  For example, when a prisoner claims that pervasive violence

within a prison created an obvious risk that an assault would occur, a prisoner need not

necessarily show that he "was especially likely to be assaulted by the specific prisoner

who eventually committed the assault" and therefore "it does not matter whether the risk

comes from a single source or multiple sources, any more than it matters where a

prisoner faces an excessive risk of attack for reasons personal to him or because all

prisoners in his situation face such a risk."  *Farmer*, 511 U.S. at 843.[6]  In other words,

"officers need not identify the specific assailant, but need only recognize the substantial

---

[6]The Supreme Court further illustrated this concept:
If, for example, prison officials were aware that inmate rape was so common
and uncontrolled that some potential victims dared not sleep [but] instead .
. . would leave their beds and spend the night clinging to the bars nearest the
guards' station, it would obviously be irrelevant to liability that the officials
could not guess beforehand precisely who would attack whom.
*Id.* at 843-44 (quotations and citation omitted)

risk of the claimed harm – assault." *Martinez*, 563 F.3d at 1089 n.8.  On the other

hand, when a plaintiff alleges that his injuries resulted from a more specific risk, such as

the risk of housing an inmate with particular cellmates, he must show that defendants

knew that the plaintiff's placement in the cell with those cellmates created a serious risk

to plaintiff's safety.  *See, e.g.*, *Szymanski v. Benton*, 289 F. App'x 315, 319 (10th Cir.

2008) (unpublished) ("Mr. Szymanski never claimed to be the victim of pervasive inmate

violence.  Rather, his complaint is based on the alleged failure of detention-center

personnel to protect him from Mr. Wallace."); *Verdecia*, 327 F.3d at 1175.

## IV.  ANALYSIS

Defendants' motion to dismiss asserts arguments specific to each defendant.

*See, e.g.*, Docket No. 15 at 15.  Plaintiff's brief does not respond to defendants'

argument by identifying specific allegations supporting its claim against each individual

defendant; rather, plaintiff generally argues that, while defendants are grouped together

in the complaint, the complaint states a claim that each defendant violated Mr.

Roemer's Eighth Amendment rights.  *See* Docket No. 24 at 18-20.  Given the fact that

plaintiff is required to allege that each defendant personally participated in the alleged

constitutional violation and that each defendant acted or failed to act in spite of

subjective awareness of a substantial risk of serious harm, plaintiff's failure to identify

specific allegations establishing either of those things with respect to each individual

defendant does not necessarily satisfy its burden under the first prong of the qualified

immunity analysis.  *See Robbin*s, 519 F.3d at 1250.  Nonetheless, where appropriate,

the Court will review plaintiff's complaint in an attempt to determine whether plaintiff has stated a claim against each individual defendant.

### A.  June 2012 Conditions Risk

To the extent plaintiff's Eighth Amendment claim is premised on the June 2012 conditions risk, he fails to plausibly allege both requisite elements.  As to the objective element, although plaintiff alleges that the June 2012 conditions "substantially and foreseeably increased the risk of violence within the prison," Docket No. 1 at 12, ¶ 42, such allegation is conclusory and lacks sufficient factual support.  Plaintiff alleges that prisoners subject to the controlled movement schedule had limited time to conduct "everyday tasks" outside their cells and were forced to choose between conducting such tasks and accessing programs, the yard, or the gym.  Docket No. 1 at 10-11, ¶¶ 36-39.  Plaintiff alleges that these circumstances caused Unit 2 prisoners to be locked in a cell for 18 hours per day "with another person who may or may not have been mentally ill, violent, a gang member, a serial killer, severely damaged by years of solitary confinement, sociopathic, etc." and "substantially increased the tension and frustration of prisoners at SCF, thereby increasing the volatility of an already dangerous prison."  *Id.* at 11, ¶¶ 40-41.  Plaintiff alleges that this condition was exacerbated by regular lockdowns, including a lockdown that began in June 2012 and lasted for six days.  Even when these facts are viewed in the light most favorable to plaintiff, these facts do little more than describe prison conditions that, at certain times, may exist at a prison housing violent offenders.  Plaintiff does not allege any facts or cite any authority suggesting that giving prisoners limited time to conduct tasks outside their cells gives rise to an objectively serious risk of cellmate-on-cellmate violence.  Similarly, the mere

fact that an inmate is double celled with another inmate for 18 hours per day or the mere fact that SCF West was periodically placed on lockdown, further increasing the time inmates were confined to their cells, does not plausibly give rise to an objectively serious risk of violence.  Although plaintiff alleges that four homicides occurred in SCF West, *id.* at 12, ¶ 43, there is no indication that they occurred under circumstances similar to the June 2012 conditions.  The homicides occurred before institution of the controlled movement schedule and plaintiff does not allege any facts indicating that the murders were the result of cellmate-on-cellmate violence.

The complaint alleges that Mr. Medina, Mr. Carochi, and Mr. Milyard received the November 2011 letter from the ACLU describing conditions at LCF.  Docket No. 1 at 12, ¶ 45.  The complaint alleges that SCF and LCF were both "dangerous and violent" places and hindered access to outdoor recreation and libraries.  Docket No. 1 at 12, ¶¶ 45-46.  However, these conclusory allegations do not form a plausible analogy between the two facilities for purposes of establishing the existence of an objectively serious risk at SCF.  Plaintiff therefore fails to allege sufficient facts upon which to conclude that the June 2012 conditions created an objectively serious risk.

As to the subjective component, plaintiff alleges that "[e]ach and every defendant was aware that the June 7, 2012, lockdown created a substantial risk of cellmate-on-cellmate violence," that "a substantial risk of attack by [a] cellmate exists at SCF, and in particular existed in Unit 2 of SCF . . . ," Docket No. 1 at 12-13, ¶¶ 52-53,  and that Mr. Carochi, Mr. Milyard, Mr. Falk, Mr. Chapdelaine, Ms. Cox-Bergman, and Ms. Nycz "knew of and/or implemented conditions of confinement at SCF, including in SCF Unit 2, that objectively and obviously created a substantial risk of serious harm to Mr.

Roemer, and disregarded that risk." *Id.* at 22, ¶ 100. Plaintiff alleges that such risks

are "obvious, previously-known, and well-documented." *See, e.g.*, *id.* at 14, ¶ 52. Such

allegations are conclusory and not therefore entitled to the presumption of truth.

Moreover, the collective nature of such allegations and lack of corresponding factual

support is insufficient to establish that each individual defendant acted (or failed to act)

with the requisite state of mind. *See Robbins*, 519 F.3d at 1250. As discussed above,

the complaint contains no facts indicating that the four previous homicides in SCF West

occurred under circumstances similar to the June 2012 conditions so as to place

defendants on notice of a substantial risk of cellmate violence. *See Barney v.*

*Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998) ("[w]ithout any evidence of[, among

other things,] . . . previous incidents of sexual misconduct by Box Elder County Jailers,

plaintiffs have failed to raise a fact question on whether the Sheriff and the

Commissioners acted with deliberate indifference"). Because the complaint does not

establish similarities between SCF and LCF, the ACLU letter also fails to place

defendants on notice of any substantial risk of cellmate violence. Plaintiff does not, for

example, allege that an increase in cellmate assaults occurred on prior occasions when

controlled movement schedules and lockdowns were implemented. *See Farmer*, 511

U.S. at 842 (holding that subjective element can be satisfied when risk of inmate

attacks was "longstanding, pervasive, well-documented, or expressly noted by prison

officials in the past, and the circumstances suggest that the defendant-official being

sued had been exposed to information concerning the risk and thus must have known

about it" (quotations omitted)). Moreover, plaintiff does not allege the occurrence of any

events in Unit 2 that evidenced the "increasing the volatility of an already dangerous prison," Docket No. 1 at 11, ¶¶ 40-41, let alone that any defendant perceived (or was informed of) such events.  *Cf. Jensen v. Gunter*, 807 F. Supp. 1463, 1483 (D. Neb. 1992) (listing circumstances that led to conclusion that risk of cellmate violence was pervasive), *aff'd* 94 F.3d 1191 (8th Cir. 1996).  Thus, plaintiff fails to plausibly allege that any of the defendants actually drew the inference that the June 2012 conditions could create a substantial risk of cellmate violence.[7]  This aspect of plaintiff's claim is dismissed.[8]

---

[7]Plaintiff alleges that all defendants housed Mr. Roemer – who was a non-violent prisoner serving a short sentence – in Unit 2 knowing that he would be in conditions substantially likely to cause him to be attacked by a cellmate.  Docket No. 1 at 15, ¶¶ 60-61.  Not only does this allegation fail to isolate each defendant's role in placing Mr. Roemer in Unit 2, Mr. Roemer's characteristics as a non-violent prisoner serving a short sentence do not give rise to an objectively serious risk that he would be assaulted by a cellmate.  Moreover, such characteristics do not, by themselves, give rise to an obvious or pervasive risk that he would be assaulted by a cellmate.  *Cf. Howard v. Waide*, 534 F.3d 1227, 1238 (10th Cir. 2008) (concluding that, because inmate was openly gay and slight of build, jury could infer that those characteristics were obvious to defendants and, as a result, that he was particularly vulnerable to assault); *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001) (holding that labeling an inmate a snitch with knowledge of danger associated with doing so violates the Eighth Amendment).  Thus, this aspect of plaintiff's Eighth Amendment claim fails.

[8]Even assuming that plaintiff could establish that defendants violated the Eighth Amendment with respect to the June 2012 conditions risk, plaintiff fails to identify any authority, as is its burden, suggesting that imposing a controlled movement schedule and a lockdown under these circumstances violated clearly established law.  No such authority is apparent to the Court.  *See Rhodes v. Chapman*, 452 U.S. 337, 348-50 (1981) (holding that double celling does not violate the Eighth Amendment); *Jones v. Goord*, 435 F. Supp. 2d 221, 241 (S.D.N.Y. 2006) (holding that general increase in risk from double celling "cannot in and of itself violate the Constitution; otherwise double-celling would be unconstitutional per se, or would be constitutional only if cellmates never assaulted each other").

### B.  Risk From Mr. Farley

The Court turns to the portion of plaintiff's Eighth Amendment claim based upon the risk from Mr. Farley.  Defendants do not appear to challenge the objective element with respect to the risk from Mr. Farley and, upon review, the Court finds that plaintiff has plausibly alleged that Mr. Farley's violent history created an objectively serious risk that he would harm a cellmate.  The question therefore becomes whether plaintiff has stated a plausible claim that each defendant personally participated in an Eighth Amendment violation and, if so, whether each defendant acted with the requisite state of mind.

#### 1.  Intelligence Defendants

Plaintiff's complaint alleges that the intelligence defendants knew of information that demonstrated that Mr. Farley could not be safely housed with a cellmate, but failed to take reasonable measures to protect Mr. Roemer.  Docket No. 1 at 23, ¶ 103.  Defendants argue that plaintiff fails to allege that the intelligence defendants personally participated in the alleged Eighth Amendment violation.  Docket No. 15 at 15-16.  The Court agrees with defendants.  Plaintiff alleges that the intelligence defendants were responsible for investigating dangerous and disruptive behavior at SCF.  Docket No. 1 at 6-7, ¶¶ 15-17.  However, plaintiff does not allege that, prior to his assault on Mr. Roemer, Mr. Farley engaged in any such behavior while at SCF.  Plaintiff does not allege that the intelligence defendants had any control over where Mr. Roemer or Mr. Farley were housed such that, even if they were aware of the alleged risk, they could have taken steps to abate it.  *See Tafoya v. Salazar*, 516 F.3d 912, 922 (10th Cir. 2008)

("The relevant inquiry is 'whether an official's acts or omissions were the cause – not merely a contributing factor – of the constitutionally infirm condition." (quotations omitted)).  In short, plaintiff's complaint does not identify or otherwise provide notice of what acts or inactions on the part of the intelligence defendants violated Mr. Roemer's rights.  *See Robbins*, 519 F.3d at 1250.  Plaintiff therefore fails to state a claim against the intelligence defendants.

### 2.  Case Manager Defendants

Plaintiff alleges that Mr. Farley complained to Case Manager Herrera that placing him in general population was inappropriate and asked for treatment or programming that would treat his "violent tendencies."  Docket No. 1 at 20-21, ¶ 90.  Case Manager Herrera denied his request.  *Id.*  Although plaintiff alleges, in conclusory fashion, that Mr. Farley's violent tendencies were obvious, he does not provide sufficient facts upon which to plausibly conclude that Case Manager Herrera was aware of the homicidal and violent ideations Mr. Farley developed while with ADOC.  Moreover, plaintiff does not identify what treatment or programming would have been available to Mr. Farley or the effect that providing such treatment would have had on him.  *See Tafoya*, 516 F.3d at 922.  Plaintiff does not allege that Case Manager Herrera had any ability to otherwise mitigate the alleged risk that Mr. Farley posed to his cellmates.  Thus, plaintiff fails to state a claim against Case Manager Herrera.

Plaintiff's claim as to Mr. Showaga is not that he failed to abate the risk from Mr. Farley, but that, by recommending that Mr. Farley be housed in general population, Mr. Showaga helped to create the risk from Mr. Farley.  Plaintiff alleges that Mr. Showaga was responsible for evaluating incoming CDOC prisoners, making a custody

25

recommendation to CDOC that informs the decision as to where the incoming prisoner is placed, and determining whether those prisoners who had been housed in administrative segregation should be referred to "transitional programs."  Docket No. 1 at 7-8, ¶ 19.  Plaintiff alleges that Mr. Showaga recommended that Mr. Farley be placed in general population, where he would have cellmates, and deviated from sound correctional practices in failing to recommend that he receive transitional programming to address his violent tendencies.  *Id.* at 18, ¶¶ 80-81.  This plausibly establishes Mr. Showaga's personal participation in creating a risk that Mr. Farley would assault a cellmate.

As to the subjective element, the complaint plausibly alleges that, in light of his duties, Mr. Showaga was aware of Mr. Farley's ADOC history, including the fact that Mr. Farley had violently assaulted multiple cellmates and helped to kill a prisoner in an adjacent cell while incarcerated with ADOC, and was also aware of ADOC's recommendation that Mr. Farley not be housed with a cellmate due to the risk that he would harm him.  Docket No. 1 at 18, ¶¶ 78-79.  As the person responsible for evaluating incoming CDOC prisoners, it is plausible that Mr. Showaga was aware of DRDC's recommendation that Mr. Farley not be housed with a cellmate.  *See id.* at 18, ¶¶ 78-80.  These facts, of which Mr. Showaga was aware, created an obvious risk that Mr. Farley would harm a future cellmate if placed in general population.  Mr. Showaga ignored Mr. Farley's violent history as well as ADOC's and DRDC's recommendations and instead classified Mr. Farley so as to allow him to be housed in general population where he would have a cellmate.  Thus, plaintiff has plausibly alleged that Mr. Showaga acted in conscious disregard of the risk that Mr. Farley would assault a cellmate.

26

### 3. CDOC Defendants

Defendant argues that plaintiff fails to allege that Mr. Carochi and Mr. Milyard personally participated in the alleged Eighth Amendment violation and lacked the requisite subjective intent.  Docket No. 15 at 14-15.  Plaintiff alleges that "[e]ach and every Defendant knew of the risk posed by housing Mr. Farley in a double-celled, general population environment, yet actively participated in the decision to house him in such an environment" or failed to reasonably respond to such a risk.  Docket No. 1 at 22, ¶ 101.  This allegation is conclusory and fails to provide adequate notice.  Plaintiff nonetheless argues that allegations identifying multiple defendants who participated in a particular decision are sufficient because they establish that the identified defendants engaged in "collective decision-making."  Docket No. 24 at 25.  However, the mere allegation that Mr. Carochi or Mr. Milyard participated in a particular decision or collectively had knowledge of a particular fact, without more context as to how the decision was made, each defendant's particular role in making it, or how a defendant acquired such knowledge, is insufficient to identify "each individual defendant's culpable actions."  *See Hart v. Salois*, 605 F. App'x 694, 701 (10th Cir. 2015) (unpublished).  For that reason, the Court rejects plaintiff's argument that such allegations provide sufficient notice to and state a plausible claim against a particular defendant.

Plaintiff alleges that Mr. Carochi was responsible for the safe housing of approximately 22,000 inmates and that Mr. Milyard was responsible for the safe housing at one half of CDOC facilities, including SCF.  Docket No. 1 at 2-3, ¶¶ 3-4.  However, this general description of their job responsibilities is vague and, at most, suggests that Mr. Carochi and Mr. Milyard acted in a supervisory capacity with respect

27

to the decision to house Mr. Farley in SCF's general population.  *See Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*").  Plaintiff does not otherwise allege any facts explaining what role Mr. Carochi and Mr. Milyard – who are charged with supervising multiple facilities – have in dictating, approving, or changing the housing assignment of a particular inmate.  Plaintiff therefore fails to establish that Mr. Carochi and Mr. Milyard personally participated in the alleged constitutional violation.[9]

Plaintiff alleges that Mr. Archuleta and Mr. Medina were both responsible for ensuring that CDOC prisoners were appropriately classified and safely housed, Docket No. 1 at 3, ¶¶ 5-6, but this allegation is vague and does not shed any light on what role Mr. Archuleta and Mr. Medina had in the decision to house Mr. Farley in Unit 2 at SCF. The complaint implies that the Director of Offender Services generally makes the final decision as to how inmates are classified, *id.* at 7-8, ¶ 19, and alleges that Mr. Archuleta and/or Mr. Medina "approved Mr. Farley's placement in general population" without providing him treatment or programming to address his violent ideations and "approved the decision to send Mr. Farley to SCF."  Docket No. 1 at 19, ¶ 82.  However, the mere fact that Mr. Archuleta and Mr. Medina "approved" Mr. Farley for placement in general population in the course of supervising the safe housing of all CDOC prisoners

---

[9]Although the complaint alleges that Mr. Milyard served as both Deputy Director of Prisons and the Warden of SCF, as discussed below, regardless of which position he occupied at the relevant time, plaintiff's complaint does not place Mr. Milyard on notice of what culpable action he took and does not establish the requisite state of mind.  *See Vega v. Davis*, 572 F. App'x 611, 618 (10th Cir. 2014) (unpublished) ("it is not plausible to infer that a warden is aware of everything that happens to each inmate in his custody" (quotation omitted)).

does not, by itself, provide sufficient information regarding their role in the claimed constitutional violation.[10]   *See Iqbal*, 556 U.S. at 676.[11]

Even if plaintiff stated a claim that Mr. Archuleta and Mr. Medina personally participated in the claimed violation by approving Mr. Farley's placement in general population at SCF, plaintiff fails to establish that Mr. Archuleta and Mr. Medina acted with the requisite state of mind.  Although plaintiff alleges that ADOC "notified CDOC of [Mr. Farley's] violent history," Docket No. 1 at 18, ¶ 78, such an allegation does not, by itself, establish that Mr. Archuleta and Mr. Medina were personally aware of such information.  *See Robbins*, 519 F.3d at 1250 (noting importance of distinguishing claims against individuals from "collective allegations against the state").  Plaintiff does not allege that Mr. Archuleta and Mr. Medina were aware of Mr. Farley's homicidal or violent ideations during his incarceration with ADOC.  As discussed above, paragraph 101 of plaintiff's complaint is conclusory, collective, and by itself insufficient to establish

_____

[10]It appears from plaintiff's complaint that the CDOC defendants have general supervisory authority over CDOC facilities, but plaintiff does not appear to assert a claim of supervisory liability.  Even if plaintiff were to assert such a claim, plaintiff does not allege sufficient facts to plausibly establish at least two of the three requisite elements.  *See Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) ("A plaintiff may therefore succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.").

[11]Plaintiff alleges that Mr. Archuleta and Mr. Medina participated in the decision to house Mr. Roemer in Unit 2, knowing that it was one of the most violent and dangerous units in the CDOC system and knowing that such conditions were likely to cause Mr. Roemer to be attacked by a cellmate, but this allegation appears to refer to the June 2012 conditions risk, which, as discussed above, is insufficient to establish an Eighth Amendment violation.  Docket No. 1 at 15, ¶¶ 60-61.

that any individual defendant knew about Mr. Farley's violent history while with ADOC. Although plaintiff plausibly alleges that Mr. Showaga became aware of Mr. Farley's history prior to Mr. Farley's placement at SCF and that other defendants became aware of Mr. Farley's history after he arrived at SCF, *see* Docket No. 1 at 19, ¶ 83, plaintiff fails to state a plausible claim that Mr. Archuleta and Mr. Medina were aware of such facts at the time they played a role in the decision to place Mr. Farley in general population at SCF.  Thus, plaintiff fails to state a plausible claim that Mr. Archuleta and Mr. Medina were aware of and disregarded the risk that Mr. Farley would assault a cellmate.

### 4.  Executive and Unit 2 Defendants

Plaintiff alleges that the executive and Unit 2 defendants knew of Mr. Farley's violent history and allowed him to be housed in Unit 2 with a cellmate without treatment or programming. *Id.* at 19, ¶ 83.  However, this allegation does not, by itself, sufficiently "isolate the allegedly unconstitutional acts of each defendant," *see Robbins*, 519 F.3d at 1250, and the complaint does not otherwise explain what role each executive and Unit 2 defendant had in housing Mr. Farley in Unit 2.  Plaintiff's complaint alleges that Mr. Showaga's recommendation that plaintiff be placed in general population caused Mr. Farley to be housed in general population, Docket No. 1 at 18-19, ¶ 81, but does not allege that the executive or Unit 2 defendants had any say in whether Mr. Farley would be housed in general population and what CDOC facility he would reside at.  Thus, plaintiff does not plausibility allege that the executive or Unit 2 defendants personally participated in creating the risk posed by Mr. Farley.

The executive and Unit 2 defendants may nonetheless be liable for failing to take reasonable measures to abate the risk from Mr. Farley, even if the risk was created by someone else. *See Castillo v. Day*, 790 F.3d 1013, 1020 (10th Cir. 2015) ("a prison guard's failure to take reasonable steps to protect an inmate from a known risk of sexual abuse by another prison guard can be a violation of the Eighth Amendment"). The Eighth Amendment requires only reasonable safety. *Howard v. Waide*, 534 F.3d 1227, 1239 (10th Cir. 2008). "An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly [or] recklessly declined to act." *Id.* (quotations omitted). Courts therefore look to what actions defendants take, if any, "as well as available alternatives that might have been known to [them]." *Id.* at 1240. Although plaintiff contends that treatment or programming would have mitigated the risk that Mr. Farley would harm a cellmate, plaintiff does not suggest what treatment or programming was available or what beneficial effect it would have had. Plaintiff does not otherwise identify any specific actions or inactions on the part of the executive or Unit 2 defendants that increased or failed to mitigate the risk that Mr. Farley would harm a cellmate; rather, plaintiff implicitly suggests that Mr. Farley should not have had a cellmate under any circumstances. However, in part because of Mr. Showaga's conduct, by the time Mr. Farley reached SCF, CDOC had already classified Mr. Farley as a general population inmate and assigned him to SCF. Plaintiff does not plausibly allege that the executive or Unit 2 defendants had any ability to overrule CDOC's classification of Mr. Farley and remove Mr. Farley from general population.

31

Although the executive and Unit 2 defendants plausibly had the ability to temporarily place Mr. Farley in his own cell or to appeal to CDOC to change Mr. Farley's classification once Mr. Farley arrived at SCF, plaintiff does not allege that the executive and Unit 2 defendants had reason to do so. Plaintiff's complaint does not allege that Mr. Farley engaged in any behavior while housed at SCF which should have caused the executive or Unit 2 defendants to remove Mr. Farley from general population or request that CDOC reevaluate his classification. To the contrary, Mr. Farley had four cellmates at SCF without such cellmates triggering a violent reaction from Mr. Farley before Mr. Roemer became his cellmate. Although plaintiff alleges that Mr. Farley's cellmate prior to Mr. Roemer "felt threatened by Mr. Farley," *id.* at 19-20, ¶ 86, plaintiff does not allege that the cellmate communicated those concerns to Correctional Officer Boyer or Sergeant Clements. The complaint alleges that, in the days and weeks leading up to his death, Mr. Roemer began to fear for his life because of Mr. Farley's threatening statements and asked Correctional Officer Boyer for a reassignment, a request which Correctional Officer Boyer denied. *See* Docket No. 1 at 21, ¶ 91. However, the facts as presently alleged do not indicate that Mr. Roemer told Correctional Officer Boyer about Mr. Farley's threatening statements or expressed to any defendant that he feared for his life. Thus, plaintiff has failed to plausibly allege that the executive and Unit 2 defendants violated Mr. Roemer's Eighth Amendment rights by failing to take reasonable steps to protect him from the risk posed by Mr. Farley. *See Howard*, 534 F.3d at 1239.

Plaintiff alleges that, in addition to failing to mitigate the risk posed by Mr. Farley, Correctional Officer Boyer and Sergeant Clements acted with deliberate indifference by

32

granting Mr. Farley's request that Mr. Roemer become his cellmate, knowing (1) Mr.

Farley's violent history, (2) Mr. Roemer's short sentence, and (3) the conditions in Unit

2.  Docket No. 1 at 20, ¶¶ 87-88.  However, as discussed above, Correctional Officer

Boyer and Sergeant Clements were not in a position to overrule Mr. Farley's

classification and, based upon Mr. Farley's behavior at SCF, had no reason to move

Mr. Farley to his own cell.  The mere fact that Mr. Roemer was serving a short sentence

does not, by itself, suggest that he was more vulnerable to assault than other inmates.

And plaintiff fails to allege that the June 2012 conditions risk was obvious.  Plaintiff

does not allege that Mr. Farley's fourth cellmate or Mr. Roemer actually expressed to

Correctional Officer Boyer or Sergeant Clements any fear or apprehension that Mr.

Farley would assault them.  Plaintiff's complaint does not allege that Mr. Farley had an

ulterior motive by requesting that Mr. Roemer be moved into his cell.  As a result,

plaintiff has failed to plausibly allege that, by moving Mr. Farley and Mr. Roemer into the

same cell, Correctional Officer Boyer's and Sergeant Cements' conduct increased the

risk from Mr. Farley or that they knowingly or recklessly failed to take reasonable

measures to protect Mr. Roemer.  Moreover, for the same reasons, plaintiff fails to

allege sufficient facts upon which to conclude that Correctional Officer Boyer and

Sergeant Clements acted with the requisite state of mind.  Thus, plaintiff has failed to

state a plausible claim that Correctional Officer Boyer and Sergeant Clements violated

Mr. Roemer's Eighth Amendment rights by their conduct in placing Mr. Farley and Mr.

Roemer in the same cell.

### C.  Clearly Established Law

Plaintiff has established the first prong of the qualified immunity analysis by stating a plausible claim that Mr. Showaga violated Mr. Roemer's Eighth Amendment rights by consciously disregarding the risk that Mr. Farley would harm his cellmate.  The Court therefore turns to the second prong, which requires plaintiff to establish that Mr. Showaga violated clearly established law.  It is well established that an inmate has a right to be protected from substantial risks of assault at the hands of fellow prisoners. *See Howard*, 534 F.3d at 1242 (citing *Farmer*, 511 U.S. at 833-34; *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980) ("[A]n inmate does have a right to be reasonably protected from constant threats of violence and sexual assaults from other inmates")). Although *Farmer* does not, in all cases, settle every question with respect to prison officials who fail to prevent an assault, *see Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050-51 (9th Cir. 2002) (holding that it is not always sufficient, for purposes of the second prong of the qualified immunity analysis, "that *Farmer* clearly states the general rule that prison officials cannot deliberately disregard a substantial risk of serious harm to an inmate"), here, *Farmer* and its progeny make sufficiently clear that a reasonable officer in Mr. Showaga's position would have known that by recommending that Mr. Farley be placed in general population, thereby disregarding Mr. Farley's violent history as well as ADOC and CDOC's recommendations that Mr. Farley not be housed in general population, he was subjecting Mr. Farley's cellmate to an unreasonable risk of assault in violation of the Eighth Amendment.  Thus, the Court finds that Mr. Showaga is not entitled to qualified immunity.

## V.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P.

12(b)(6) [Docket No. 15] is **GRANTED** in part and **DENIED** in part as indicated in this

order.  It is further

**ORDERED** that plaintiff's claims against Tony Carochi, Kevin Milyard, Lou

Archuleta, Angel Medina, James Falk, John Chapdelaine, May Cox-Bergman, Michelle

Nycz, Robert Keisel, Chase Felzein, Correctional Officer Boyer, Sergeant Clements,

Eva Little, Michael Tidwell, Neil Magelssen, and Case Manager Herrera are

**DISMISSED**.

DATED September 29, 2015.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge